ALLYNE-ZERK COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 34826. Promulgated February 23, 1934.

*John H. Watson, Jr., Esq.*, for the petitioner.
*Arthur H. Fast, Esq.*, for the respondent.

#### OPINION.

ARUNDELL: This proceeding was brought to redetermine a deficiency in income tax of the petitioner for the year 1924 in the sum of $27,362.89.

A bad debt issue was settled by stipulation. The remaining issue is whether or not the sale by a corporation of its property and assets for cash, and the surrender for cancellation of a portion of its own outstanding shares of capital stock resulted in taxable income to petitioner.

The facts were stipulated and so far as material they are as follows:

The petitioner is a corporation, organized under the laws of the State of Ohio, with its principal office in the city of Cleveland, Ohio. The petitioner filed a certificate of dissolution with the Secretary of State of the State of Ohio on February 9, 1925, but under the laws of the State of Ohio it retains and has the right to institute and prosecute this proceeding in its corporate name.

On December 29, 1924, the petitioner and the Bassick Manufacturing Co., hereinafter called the Bassick Co., entered into a contract which provided for the sale to the Bassick Co. of all the property and assets of the petitioner. The Bassick Co. agreed to pay the sum of $410,066.67, to assume and pay all of the petitioner's liabilities (except taxes and assessments for 1923 and preceding years and claims against the petitioner not appearing on the petitioner's books and also income taxes due from the petitioner by reason of the said sale) and " to surrender or cause to be surrendered (to petitioner) for cancellation " 5,640%₁₃ shares of the petitioner's capital stock. The assets of the petitioner cost and were of the value of $597,044.65. Its liabilities were $130,047.41. Therefore, the net cost or value of the assets so sold was $466,997.24. The contract was duly and fully performed during the year 1924. The Bassick Co. paid $410,066.67 in cash and surrendered the 5,640%₁₃ shares of the petitioner's capital stock, which thereupon were canceled at the same time as the transfer of the property and assets of the petitioner and the delivery of the said shares of stock, as a part of the closing of the transaction.

On December 29, 1924, and up to the time of the closing of the transaction, shares of the capital stock of the petitioner were issued and outstanding to the number of 12,533, all of one class.

Apart from the profit or loss incident to the sale provided for in the contract of December 29, 1924, the petitioner's net income for the year 1924 was $248,003.99. In its income tax return for that year the petitioner deducted $61,214.83 as representing its loss in the above transaction.

In his deficiency notice dated December 12, 1927, the respondent computed the petitioner's profit from the sale of its assets by adding to the cash price of $410,066.67 the value of 5,640%₁₃ shares of its stock at $37.40 per share, or $210,961.89, making total receipts of

$621,028.56, from which he deducted a net cost of assets at $468,747.24 (instead of $466,997.24 as stipulated). There is no issue as to the value of the stock.

The first matter requiring consideration is whether the transaction was a unified whole and so to be considered, or whether the parts thereof were susceptible of separate and individual treatment. More concretely, did the surrender for cancellation of 5,640%₃ shares of petitioner's stock form part of the consideration for the sale?

On study of the contract it is evident that all of the commitments of the Bassick Co.—to pay $410,066.67, to assume petitioner's liabilities, and to surrender the stock—were integral parts of the consideration moving to petitioner and inducing the sale. To hold otherwise would be to hold that the surrender of the stock was a gift, which is contrary both to fact and reason. Undoubtedly the surrender of the stock was a vital part of the consideration. It follows that the transaction was not divisible and was such as may give rise to gain or loss. It was an ordinary sale of property for cash and other considerations, among them, the surrender for cancellation of a block of petitioner's stock.

Various views have been expressed on the question here presented, but the latest pronouncements are to the effect that the receipt by a corporation of its own stock as consideration upon the sale of property or in satisfaction of indebtedness may result in gain or loss. See *Houghton & Dutton Co.*, 26 B.T.A. 52; *Walville Lumber Co.* v. *Commissioner*, 35 Fed. (2d) 445; *Spear & Co.* v. *Heiner*, 54 Fed. (2d) 134; affd., 61 Fed. (2d) 1030; *Commissioner* v. *S. A. Wood Machine Co.* 57 Fed. (2d) 635; certiorari denied, 287 U.S. 613; *Commissioner* v. *Boca Ciega Development Co.*, 66 Fed. (2d) 1004. True, in the cases cited, the stock surrendered was the sole consideration, but the decisions do not rest on that fact. They treat the stock as but a medium of payment for the property sold or the debt satisfied. The fact that part of the consideration is cash does not change the character of the stock as consideration.

On authority of the above cases we hold that petitioner realized income to the extent of the difference between cost of the assets sold and the consideration received, consisting of cash plus stock at its then value.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

Murdock dissents.

---

Van Fossan, dissenting: I agree with the holding of the majority that the contract in this case was indivisible and that the entire transaction was one on which gain or loss may be predicated. I

must dissent however from the conclusion that under the facts in this case the petitioner realized a gain from the surrender for cancellation of a block of its own stock.

The whole theory of income taxation is based on the concept that, where the taxpayer has acquired an increment, a gain, a profit, he should pay a tax thereon. Whereas he formerly had 100 units of value, now he has 100 units plus 10. The 10 units are taxable.

In this case we are looking at the situation solely as to the tax liability, i.e., the gain in money or property, of the corporation. We are not here concerned with the tax problems of the stockholders. So viewing the picture, wherein under the facts is petitioner richer than before the sale? How does the number of units of value possessed by petitioner after the sale compare with the number possessed before the sale? The answer to these questions seems simple when we resort to the figures in the case. Whereas petitioner had $466,997.24 in property available for distribution to stockholders, it now has $410,066.67 in property so available. The fact that the $410,066.67 is all cash while the $466,997.24 was part cash and partly other propery is beside the question. It was agreed that $466,997.24 represented the net cost and value of all assets, cash or otherwise. Therefore, for the purposes of this case it must be treated as equal to cash. Similarly, it would seem to be wholly immaterial to the question of gain to the corporation that whereas before the sale it would, on distribution, have divided the $466,997.24 among 12,533 shares, after the sale it would divide the $410,066.67 among 6,892⅓ shares. The number of stockholders is immaterial so far as the corporation in liquidation is concerned.

When we ask the question: How is petitioner corporation better off financially by the cancellation?, we find the picture to be as follows: Before the sale there were 12,533 shares of stock entitled to share in net assets of an agreed value of $466,997.24. After the sale and cancellation there are 6,892⅓ shares of stock entitled to share in net cash assets of $410,066.67. Undoubtedly each remaining shareholder is in a better position than before the sale,—his stock is worth more because there are fewer shareholders entitled to share in the distribution. But wherein is the corporation in a better financial position? If it be said that it is *pro tanto* released from the liability created by the right of the shareholders to share in the distribution of the assets, it should be rejoined that as the liability of each share of stock was wiped out a new and proportionately equal additional right or liability was created as to the remaining stockholders. The cancellation of part of the stock merely transferred the rights formerly held by some of the stockholders to those remaining.

It is of no moment that the stock surrendered for cancellation was valuable. True, it was valuable in the hands of the stockholders before surrender, but on surrender and cancellation its value passed, not to the corporation, but to the other stockholders, whose shares were made proportionately more valuable. The assets of the corporation were not affected by the transmutation.

Respondent held that the receipt of the shares represented a gain of $210,961.89 to petitioner, or that the total receipts from the sale were $621,028.56. Obviously if petitioner received this sum, it was then available for the distribution which shortly followed. The simple fact is however that the corporation received only $410,066.67 and this amount and no more was available for distribution.

Taxation is a practical matter, it has been said, and, looked at practically, I am unable to see any basis for holding that the surrender and cancellation of part of petitioner's stock added one cent to the income, the assets, or the net worth of the petitioner corporation. There was nothing additional available for distribution to shareholders on the liquidation of the corporation.

This case differs in its vital facts from any heretofore considered by the Board. In *S. A. Woods Machine Co.*, 21 B.T.A. 818, the stock was the sole consideration received in satisfaction of an obligation arising from a compromise settlement of litigation. The effect of our decision was to hold the transaction nontaxable. The Circuit Court of Appeals, in *Commissioner* v. *S. A. Woods Machine Co.*, 57 Fed. (2d) 635, reversed our decision, but in their opinion observed: " Whether the acquisition or sale by a corporation of its own capital stock gives rise to taxable gain or deductible loss depends on the real nature of the transaction involved." Here we hold the transaction to be one on which gain or loss may be recognized, but I am unable to perceive that the stock phase of the transaction made for either gain or loss. The learned court observed further: " If it was in fact a capital transaction, i.e., if the shares were acquired or parted with in connection with a readjustment of the capital structure of the corporation the Board rule (neither gain nor loss) applies." In the instant case the " surrender * * * for cancellation " of the block of stock would seem to be within this observation. Continuing further the court stated: " But where the transaction is not of that character, and a corporation has legally dealt in its own stock as it might in the shares of another corporation *and in so doing has made a gain or suffered a loss*, we perceive no sufficient reason why the gain or loss should not be taken into account in computing the taxable income." (Italics supplied.) In the case before us we have seen that the stock was surrendered for cancellation. It was not " dealt in " in any way " as it might in the shares of another corporation." Whether it made a gain or suffered a loss

(the whole transaction being held to be taxable) is the very question for decision.

The majority also relies on *Houghton & Dutton Co.*, 26 B.T.A. 52, in which the Board followed the Circuit Court of Appeals in *S. A. Woods Machine Co.*, the instant case arising in the same circuit, and *Commissioner* v. *Boca Ceiga Development Co.*, 66 Fed. (2d) 1004, in which the Third Circuit Court of Appeals followed the *S. A. Wood Machine Co.* case. Neither of these cases is, in my judgment, adequate contrary authority to the position I would take here.

Petitioner contends that not only was the Commissioner in error in finding a gain from the transaction (the gain being based on the value of the stock), but he erred further in not allowing petitioner as a loss the difference between the agreed cost of the assets sold and the cash realized.

Having concluded, as the Board has (in which I agree) that the transaction was indivisible and might give rise to gain or loss, and having reached the further personal conclusion that no gain arose from the surrender for cancellation of the block of petitioner's stock, it follows that the petitioner should be sustained in its contention as to loss suffered.

As above pointed out, the agreed cost and value of the assets was $466,997.24. The total amount received by the corporation in payment was $410,066.67. In my judgment the difference represents a deductible loss of the corporation.

McMahon and Goodrich concur in this dissent.

Sternhagen agrees with the conclusion of this dissenting opinion.

---

Trammell, dissenting: In my opinion, when the corporation gives up its assets for cash and a portion of its own stock for cancellation, there should be an allocation between the value of the assets to the extent cash was paid therefor and the value thereof represented by the exchange of stock, and that portion for which stock was received for cancellation only should be held to be a limitation to that extent. This would reduce the basis for the assets sold for cash. It is difficult to see how the corporation has acquired any gain by the acquisition for cancellation and the cancellation of stock. In so far as any value of the assets may be attributable to the stock received is concerned, that is, that portion of the value of the assets which was in excess of the cash received, might fairly be considered to be a turning back by the corporation to the stockholders of a proportionate part of assets. The assets actually left the corporation and did not come into it. The certificates of stock merely represented the pro rata share of the stockholder in the earnings of the corporation after the

payment of debts. When stock is surrendered for cancellation and for nothing else, the other stockholders may possibly receive a larger pro rata share in the earnings, but the corporation has no additional assets to take the place of what left the corporation in exchange for the stock to be canceled.

This seems to me, in so far as the stock is concerned after an allocation has been made, merely to be capital readjustment brought about by the cancellation of stock and the receipt thereof for that purpose. In my opinion this is not a case where a corporation was dealing in its own stock as an outsider would deal, but a mere corporate readjustment of capital.

It would seem clear that if three individuals contributed to a corporation three buildings and for those buildings so contributed received certificates of stock representing their pro rata contribution to the capital of the corporation, and thereafter one of the individual stockholders desired to receive his building back and the corporation gave it back and the individual surrendered his stock, the corporation would have nothing on which to base a capital gain—it would be simply a capital adjustment. This case differs from the example stated, it seems to me, only in the fact that a certain amount of cash was paid in for the corporate property transferred to its stockholders, but I see no reason why a proper allocation could not be made and treat one part of the transaction as being a mere capital adjustment and the other part as a sale of assets. I do not agree, however, that the stock transaction should be disregarded entirely.